UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE | Bankruptcy Case No. 11-62730-fra7 |
| BRIAN MICHAEL LYNCH, | |
| Debtor. | |
| LEGACY FINANCIAL SERVICES, INC., | Adversary Proceeding No. 11-06224-fra |
| Plaintiff, | |
| vs. | |
| BRIAN MICHAEL LYNCH, | MEMORANDUM OPINON |
| Defendant. | |

This adversary proceeding was brought by Plaintiff Legacy Financial Services, Inc. ("Legacy") against Defendant Brian Lynch, the debtor in the underlying chapter 7 bankruptcy case. The complaint alleges that Defendant is liable to Plaintiff for defamatory statements made prior to Defendant's petition for relief, and that the claim should be excepted from discharge as a debt for willful and malicious injury to plaintiff or its property. 11 U.S.C. §523(a)(6).[1]

---

[1] Actions to except claims from discharge are core proceedings, and triable by the bankruptcy court. 28 U.S.C. §157(b)(2)(I). While the basis of a claim is generally a matter of state law, the bankruptcy court has jurisdiction to determine the scope and amount of a debtor's liability in order to determine the extent of any discharge of that claim. In re Kennedy, 108 F.3d 1015, 1017-18 (9th Cir. 1997).

(continued...)

Page 1 - MEMORANDUM OPINION

The matter came on for trial on July 25, 2012. After considering the evidence and testimony of the parties, I conclude that Plaintiff is not liable to Plaintiff for defamation. My reasons follow.

### BACKGROUND

Plaintiff is a provider of financial advice and services, such as insurance and investments, to consumers in the Eugene area. It is one of several related businesses maintained by Davis Hinson, a certified public accountant. Defendant was, prior to his bankruptcy petition, employed by Plaintiff. At all material times, Legacy was affiliated with Capital Financial Services ("Capital"), of Minot, N. D. Capital served as Legacy's broker, and was closely involved in Legacy's day to day operations. As Legacy's principal, Mr. Hinson , put it, "every piece of business" at Legacy was reviewed by Capital. Both Legacy and Capital are subject to regulation by the Financial Industry Regulatory Authority (FINRA). While not a government agency, FINRA has extensive authority to enforce industry standards, and investigate and sanction violations. Mr. Hinson testified that FINRA has the authority to "close down" a company such as Legacy.

Defendant was hired by Mr. Hinson as a commissioned insurance salesman in March, 2007 and in 2008 he began working for Legacy. In April, 2009, Defendant announced that he was leaving Legacy to start his own competing business. Legacy and Hinson objected, pointing to a clause in Defendant's employment contract that limited competition with Legacy after leaving its employment. In June 2009, Plaintiff brought an action to enforce its contract in the Circuit Court for Lane County, Oregon. In August 2009, the Circuit Court issued a preliminary injunction.[2]

About six months later, Defendant drafted and delivered three letters which are the subject of Plaintiff's complaint:

The first letter, dated February 14, 2010, was unsigned, and faxed by Defendant to Capital. Capital sent a copy to Legacy. Mr. Hinson testified that he was "confident" that Capital forwarded the letter to

---

[1](...continued)
It follows that the bankruptcy court may enter a final judgment resolving this matter.

[2] The record in this adversary proceeding is unclear as to the outcome of the Circuit Court case.

Page 2 - MEMORANDUM OPINION

FINRA, as required by FINRA's rules. The letter alleged that Hinson "knowingly employed" a convicted felon to work at Legacy, that the employee had access to confidential client information, and that the employee had improperly borrowed funds from customers.

The second letter was signed, and sent by Defendant to Capital. While the letter shows copies to FINRA and two state agencies, Defendant sates that he never sent the copies. The letter described the Circuit Court hearing of August 2009, and alleges that Mr. Hinson's testimony regarding his teaching activities were false. It is not clear form the letter why the testimony might have been important, and Defendant acknowledges in the letter that "Perhaps this sounds trivial...." The letter goes on to say that

> It is my direct knowledge that I have been financially destroyed by the lawsuit maliciously filed by Legacy Financial Services, Inc., and that I intend to point out and hold Mr. Hinson accountable for his perjured statements and countless misrepresentations during his hours of testimony that took place on the record on August 5th, 2009.

The third letter, also signed by the Defendant, was dated March 10, 2010. The letter notes that copies were sent to Genworth Financial and FINRA. Defendant did not recall whether he sent the copies as indicated. The letter alleges that Mr. Hinson was guilty of misconduct when he left to Defendant the task of briefing customers on changes in investments and the identity of investment managers at Genworth Financial, a duty Defendant claims in the letter that Mr. Hinson was obligated to carry out himself.

As it happens, Mr. Hinson did hire someone with a felony conviction. According to Mr. Hinson's uncontradicted testimony, he had had a background check conducted, but was not aware of the conviction until it was disclosed by the employee. The employee was discharged soon thereafter. The employee did borrow money from customers, contrary to industry rules.

As noted, each letter was directed to Capital. Given the rules and standards of the industry, and Defendant's experience in the industry, it is clear that defendant knew, or should have known, that the letters would be referred to one or more regulatory bodies, including FINRA.[3]

---

[3] Mr. Hinson testified that Defendant has also posted a number of defamatory statements on the internet, and on Defendant's twitter account. None of these statements were referred to in the complaint or
(continued...)

Page 3 - MEMORANDUM OPINION

Each of the letters prompted Capital to contact Legacy to investigate. After a "thorough" investigation in each case, Capital took no action.

After the letters were sent, Legacy was contacted by an investigator from FINRA, who ultimately spent a considerable amount of time in Legacy's offices investigating various matters, including the activities of the employee with a criminal record. The investigation made no direct reference to any complaint, but appeared to Mr. Hinson to follow an investigatory agenda that paralleled the allegations made in Defendant's letters. In any case, the investigation took the better part of a week to conduct, and entailed review of Legacy's trade blotter (a diary or register of trading activities) and client files. The result was a near shutdown of Legacy's business activities while the audit was ongoing. Mr. Hinson testified that the audit, and a followup, required approximately 900 hours of his time, and nearly 700 hours of staff time. The complaint seeks $35,000 in special damages resulting from the interference of Plaintiff's business operations and $450,000 in general damages for damage to the company's reputation.

## DISCUSSION

A. 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The willfulness element requires either a showing that the debtor had a subjective motive to inflict injury or that the debtor believed (subjectively) that injury was substantially certain to occur. In re Su, 259 B.R. 909 (9th Cir. BAP 2001), aff'd, Carrillo v. Su., 290 F.3d 1140 (9th Cir. 2002). The test for maliciousness requires "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." In re Su at 914 (quoting In re Jercich, 238 F.3d 1202, 1209 (9th Cir. 2001)).

// // //

// // //

---

[3](...continued)
placed into evidence, and it is unclear whether some or all occurred after defendant's bankruptcy petition was filed. These statements are not taken into account in this decision.

Page 4 - MEMORANDUM OPINION

B. The Defamation Claim

A claim for defamation under Oregon law requires that Plaintiff prove: (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) resulting special harm, unless the statement is defamatory *per se*, and therefore gives rise to presumptive special harm." *National Union Fire Ins. Co. v. Starplex Corp.*, 220 Or.App. 560, 584, 188 P.3d 332 (2008)(internal citation omitted). "A defamatory statement is one that would subject another to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the other is held or to excite adverse, derogatory or unpleasant feelings or opinions against the other." *Id.* (internal citation omitted). In the present case, because Plaintiff alleges defamation by libel based on publication of written materials, Plaintiff need not show that Defendant's statements were defamatory *per se* or caused Plaintiff to suffer special damages. *Pullen-Hughes v. City of* Portland, 2011 WL 7646236, p.4 (D.Or. 2011). See *Marleau v. Truck Ins Exchange*, 333 Or. 82, 94-95, 37 P.3d 148 (2001), *citing Hinkle v. Alexander*, 244 Or. 267, 279, 417 P.2d 586 (1966)(libel *per quod* not applicable in Oregon). Truth, however, is a "complete defense" to a defamation claim. *Bahr v. Ettinger*, 88 Or.App. 419, 422, 745 P.2d 807 (1987)(internal citation omitted).

(1) Privileged Communications

Certain communications may be subject to the defenses of absolute privilege or qualified privilege. The latter requires a plaintiff to prove that a defendant acted with actual malice and the former bars a defamation claim altogether. *DeLong v. Yu Enterprises, Inc.*, 334 Or. 166, 169, 47 P.3d 8 (2002).

A qualified privilege "exists to protect three kinds of statements; (1) those made to protect the defendant's interests, (2) those made to protect the plaintiff's employer's interests; or (3) those made on a subject of mutual concern to the defendant and the persons to whom the statement was made." *Id.* at 170. An absolute privilege applies when "the public's interest in the unhampered operation of the government, when exercising such functions, outweighs an individual's interest in the preservation of reputation." *Id.* at 171. Statements made in judicial and quasi-judicial proceedings have thus been found to be absolutely privileged. Examples provided by the court in *DeLong* include a letter written to the State Board of Funeral

// // //

Page 5 -   MEMORANDUM OPINION

Directors and Embalmers, when the board was sitting in its quasi-judicial function as a licensing body, and a letter to the Oregon State Bar grievance committee concerning a lawyer's alleged misconduct. See *DeLong* at 171.

While statements made to FINRA, via Capital, could be found to have been made to an organization and for a purpose serving many, if not all, of the functions of a state agency in regulating securities dealers, and thus subject to an absolute privilege, I cannot find that such a privilege applies here. A review of Oregon caselaw has revealed no instances of an absolute privilege having been applied to communications to an entity outside of a governmental organization. This is borne out by the Supreme Court's finding that

> Historically, this court has recognized the application of an absolute privilege for defamatory statements in very limited circumstances. *See Grubb v. Johnson et al.,* 205 Or. 624, 631, 289 P.2d 1067 (1955)("[t]he class of absolutely privileged communication is narrow and is practically limited to legislative and judicial proceedings and other acts of state.")

*DeLong* at 171.

I do find, however, that the communications made by Defendant may be subject to a qualified privilege as having been made to protect the Plaintiff's employer's interest. While Capital is not technically the Plaintiff's employer, it functions as the Plaintiff's broker and has a supervisory role in Plaintiff's business. Thus, to the extent a false communication was made to Capital, that communication would be protected if made without malice. A lack of malice may be found where the communication was made "in good faith, under a belief in [its] truth" and not "as a pretext to cover over secret malevolence or ill will towards the party spoken of." *See DeLong* at 172-73 (citing caselaw from other jurisdictions regarding communications to police of criminal activities). In the present situation, credible and uncontradicted testimony was given at trial that a background check had been made of the employee whom it was eventually discovered was a convicted felon, and that Plaintiff had not "knowingly" hired such a person. No evidence was presented by Defendant to show that he had any basis for believing that Plaintiff had known of the employee's background when he was hired. Moreover, the evidence is clear that Defendant was motivated in large measure by his desire to retaliate against Plaintiff for bringing the lawsuit against him in Circuit Court. I therefore find that Defendant's false statement that Plaintiff *knowingly* hired a convicted felon is not protected by a qualified privilege.

Page 6 - MEMORANDUM OPINION

(2) Measure of Damages

Plaintiff seeks in its complaint special damages of $35,000 for the attendant costs associated with the audit made by FINRA and $450,000 in general damages for damage to its reputation. Each will be discussed in turn.

(a) Special Damages

The communication made to Capital and FINRA can be broken down to two elements: The Plaintiff (1) knowingly, and (2) employed a convicted felon. The first element was untrue and the second element was admittedly true. The question becomes: would Capital and FINRA have taken the same actions which caused Plaintiff to expend the time and money making up its special damages claim had Defendant's communication omitted the untrue statement? No evidence or testimony was presented directly on this point, leaving the court to choose between two inferences. Where indirect evidence does not permit the court to choose between inferences, the court must find against the party with the burden of proof, in this case the Plaintiff. In fact, there was testimony that the usual FINRA audit generally does not take more than one to two days and that the audit in this case seemed to center around allegations made in Defendant's letter concerning the tainted employee and took close to a week. What evidence there is seems to suggest that Capital's and FINRA's actions were motivated by the true allegations that Plaintiff had employed a convicted felon and that he had had access to confidential information and had obtained a loan from a client, and not from the allegation that Plaintiff had knowingly employed this individual. The Plaintiff has therefore failed to prove that special damages were the result of Defendant's untrue statement.

(b) General Damages

In a determination of general damages, " '[t]he court determines whether a communication is capable of a defamatory meaning.' " *Hinkle v. Alexander*, 244 Or. at 278. " '[T]he case [then] goes to the jury to decide 'whether (the) communication, capable of a defamatory meaning, was so understood by its recipient.'" *Id.* (internal citations omitted).

Because the court in a bench trial, as in the present case, acts as both the court and the trier of fact, the above formulation requires that the court proceed in two steps. First, the court does find that a

Page 7 -   MEMORANDUM OPINION

communication that Plaintiff hired a convicted felon *knowingly* may be capable of a defamatory meaning. The problem in Plaintiff's case, however, is with the second step.

Evidence established at trial that Defendant's communications were published to Capital and to FINRA. Testimony was given that Capital responded to each communication with a thorough investigation and took no action. The court may and does infer from that, that Capital was satisfied after its investigation that the Plaintiff was not *knowingly* employing convicted felons and that no actions were necessary to protect Plaintiff's current and future clients. Likewise, FINRA spent close to a week auditing the Plaintiff's business and took no remedial action. The court, as the trier of fact, cannot find that either Capital, which still acts as Plaintiff's broker, or FINRA, after conducting their investigations, were of the understanding that the Plaintiff *knowingly* hired a convicted felon. The court therefore cannot find that Plaintiff's reputation in its profession was harmed by the false communications made by Defendant.

## CONCLUSION

Based on the foregoing, the court finds that Defendant is not liable to Plaintiff for allegedly defamatory statements made prior to the bankruptcy petition date regarding Plaintiff. Because Plaintiff's claim is judged to be zero, the Plaintiff's claim under 11 U.S.C. § 523(a)(6) must, by necessity, also fail. The court will enter a judgment dismissing Plaintiff's complaint.

FRANK R. ALLEY, III
Chief Bankruptcy Judge